**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROY MONTALVAN, et al.** | : | |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | **3:11-CV-850** |
| | : | **(JUDGE MARIANI)** |
| **NEVILLE'S MOBILE HOME COURT, LLC** | : | |
| | : | |
| **Defendant** | : | |

<u>**MEMORANDUM OPINION**</u>

**I. INTRODUCTION AND PROCEDURAL HISTORY**

On May 4, 2011, Plaintiffs, Roy Montalvan and Louise Montalvan, initiated the above-captioned action by filing a Complaint against William Neville and Marlene Neville t/d/b/a Neville's Mobile Home Park, alleging Violations of Clean Water Act (Count I), Violations of Clean Streams Law (Count II), Continuing Trespass (Count III), Continuing Private Nuisance (Count IV), and Negligence (Count V). (Doc. 1).

On April 24, 2012, a Consent Order and Agreement ("COA"), dated that same day and signed by Roy Montalvan, Louise Montalvan, William Neville, Marlene Neville, and counsel for Plaintiffs and Defendants, as well as the Honorable Richard Conaboy, presiding judge in the action,[1] was filed of record in this case. (Doc. 24). The COA was accompanied by a Court Order stating that the Court sanctioned the Agreement and directing that the

---

[1] On April 10, 2017, this action was reassigned to the undersigned.

action be "administratively closed without prejudice in the event either party does not comply with the terms of the settlement." (*Id.* at 1).

On March 2, 2017, Plaintiffs filed a motion to reopen the case (Doc. 26), a motion to substitute a party (Doc. 27), and a motion for contempt.  In November of 2017, Plaintiffs withdrew their motion to substitute a party and motion for contempt (*see* Doc. 42) and, that same day, filed a Motion for Substitution of Party Pursuant to Fed. R. Civ. P. 25(c), wherein Plaintiffs requested that the Court substitute Neville's Mobile Home Court, LLC, as a named party in the place of William Neville and Marlene Neville t/d/b/a Neville's Mobile Home Park. (Doc. 41).

On March 22, 2018, the Court held an evidentiary hearing and oral argument with respect to Plaintiffs' motions to re-open this action and to substitute a party.  Following oral argument, the Court orally granted Plaintiffs' motion to reopen the case (*see also*, Doc. 57 (granting motion to reopen)).  On March 27, 2018, the Court issued a memorandum opinion granting Plaintiffs' Motion for Substitution of Party and ordered the substitution of Neville's Mobile Home Court, LLC, as the Defendant in this action in the place of William Neville and Marlene Neville t/d/b/a Neville's Mobile Home Park.  (Docs. 58, 59).

Plaintiffs subsequently filed a Motion for Contempt (Doc. 60) requesting that the Court order the enforcement of the April 24, 2012 Consent Order.  Upon the request of the parties (Doc. 62), the Court entered a scheduling order allowing Defendant to file a response to Plaintiffs' Motion, limited only to its procedural defenses; and following this Court's disposition

of Defendant's procedural defenses, allowing the parties a 45-day discovery period, after which Plaintiffs would file an Amended Motion for Contempt.  (*See* Doc. 63).  In March, 2019, the Court issued a Memorandum Opinion (Doc. 71) and Order (Doc. 72) denying without prejudice Defendant's affirmative defenses of accord and satisfaction and the doctrine of laches, and its assertion that Plaintiffs lacked standing, and denying with prejudice Defendant's affirmative defense that the action is barred by the statute of limitations.  The Court further denied Plaintiffs' Motion for Contempt without prejudice to Plaintiffs filing an Amended Motion for Contempt following the completion of discovery.

On July 18, 2019, Plaintiffs' filed their First Amended Motion for Contempt (Doc. 77) accompanied by a supporting brief and 21 exhibits.  Defendant thereafter filed a brief in opposition (Doc. 78), to which Plaintiffs filed a Reply (Doc. 79).  On September 18, 2019, the Court held a hearing on Plaintiffs' Amended Motion for Contempt.  The parties thereafter filed post-hearing briefs (Docs. 84, 85, 86, 87).

## II. ANALYSIS

In their First Amended Motion for Contempt, Plaintiffs request that this Court enforce the April 24, 2012 COA, "specifically with regard to Defendants' agreement to replace a malfunctioning on-site sewage and wastewater disposal system and abate the unlawful discharge of sewage and wastewater from the Defendants' collection and disposal systems onto Plaintiffs' property and into an unnamed tributary of Wallenpaupack Creek."  (Doc. 77, at 1).  In its brief in opposition, Defendant asserts that it "fully complied with the COA and

took full, corrective action under the direct supervision of the Salem Township Sewer Enforcement Officer ('SEO') and/or the Pa. Dept. of Environmental Reserve".  (Doc. 78, at 1).  Defendant then raises the same procedural defenses previously set forth in its response to Plaintiffs' first Motion for Contempt.

Upon consideration of the testimony offered at the September 18, 2019 hearing, the documentary evidence admitted during the hearing, and the parties' pre-hearing and post-hearing briefs, the Court makes the following findings of fact and conclusions of law.

## A. Findings of Fact

1.  Plaintiff Louise Montalvan, Linda Neville (a neighbor of Plaintiffs), Gary Enslin (the Salem Township Sewer Enforcement Officer ("SEO")), and Nancy Neville a/k/a Nancy Haines[2] (owner of Neville's Mobile Home Court, LLC), each testified at the evidentiary hearing held on September 18, 2019.

2.  Nancy Neville is the owner of named-defendant Neville's Mobile Home Court, LLC. (N. Neville Test., at 137).

3.  Plaintiffs Roy Montalvan and Louise Montalvan purchased property at 386 Neville Road, Moscow, Pennsylvania, in October of 2006.  (Montalvan Test. at 6).

4.  The Montalvans purchased the property for $239,000 or $249,000.  (Montalvan Test. at 39).

---

[2] Nancy Haines is the married name of Nancy Neville.  However, at the hearing, she identified herself as Nancy Neville, and therefore, for purposes of consistency, the Court will refer to her as Nancy Neville where possible.

5.  When the Montalvans purchased the property, they obtained a $250,000 mortgage.
    (Montalvan Test. at 8, 32).

6.  The Montalvans built a house on the property in May or June of 2007 and moved
    into the house in July of 2007.  (Montalvan Test. at 6).

7.  In addition to the $250,000 mortgage, the Montalvans spent another $200,000 to
    build the house.  (Montalvan Test. at 8).

8.  The property was originally 17 acres when first purchased in October of 2006.
    However, the Montalvans subdivided a farmhouse off on 2.5 acres and the property
    is now approximately 14.3 acres.  (Montalvan Test. at 6-7, 39).

9.  The 2.5-acre parcel was sold in the price range of $130,000-$150,000.  (Montalvan
    Test. at 39-40).

10. An unnamed tributary to the Wilcox Creek runs through the Montalvans' property.
    (Montalvan Test. at 7).

11.  Neville's Mobile Home Court, LLC, is located directly across the street from the
     Montalvans' house in Moscow.  (Montalvan Test. at 9).

12. The mobile home court has been operating since before the Montalvans moved into
    their home on Neville Road. (Montalvan Test. at 9).

13. Louise Montalvan testified that she and her husband initiated the above-captioned
    lawsuit in 2011 because "once we put up our house and the porta pottys left, we
    continued to smell sewage".  (Montalvan Test. at 9) (*see also, id.* at 62-63 (stating

that she first became aware of the sewage issues "right after the porta pottys left, the smell, about a week later, appeared and never left.")).

14. On April 24, 2012, a Consent Order and Agreement ("COA") signed by Plaintiffs Roy Montalvan and Louise Montalvan, then-named Defendants William Neville and Marlene Neville, and counsel for Plaintiffs and Defendants, as well as District Court Judge Richard Conaboy, was filed of record in this case. (*See* Doc. 24).

15. The COA sets forth the background of the case and states that:

> The parties to this lawsuit agree the issues to be resolved by this Consent Order and Agreement are the replacement of Defendants' malfunctioning on-lot sewage and wastewater disposal system; the connection of all homes, mobile homes and travel trailers and other wastewater producing structures ("dwellings") located on Defendants' property to the new on lot sewage and wastewater disposal system; and the abatement of the unlawful discharge of sewage and wastewater from the Defendants' collection and disposal systems onto Plaintiffs property and into a tributary of Wallenpaupack Creek.

(COA, Doc. 24, at ¶ B).

16. The COA further provides that:

> D. The parties further acknowledge that Defendants have sealed with concrete the discharge pipe(s) leading to the tributary of Wallenpaupack Creek and have agreed to design, construct and operate a new on lot sewage and wastewater disposal system and connect all dwellings located on Defendants property to it;

> E. The parties further acknowledge that such an undertaking will entail a period of time for the completion of the engineering and designing of the project; the application and receipt of necessary permits; as well as for the actual construction and completion of, and connection to, the new on lot disposal system;

F. The parties acknowledge, that if a new on lot sewage and wastewater disposal system is not, or cannot, be installed on the property, for reasons of prohibitive costs, design flaws, or any other reason, Defendants will cease to operate the trailer court and will no longer rent spaces for trailers.

(*Id.* at ¶¶ D-F).

17. The COA also contains a section entitled "Corrective Action" which provides, in

relevant part, that the Defendants "shall complete the following actions within the

specified time periods:"

1. Defendants have sealed with concrete all discharge pipe(s) leading to the unnamed tributary to Wallenpaupack Creek. Defendants agree that they will never again unlawfully discharge wastewater and/or sewage onto Plaintiffs property and/or into the unnamed tributary to Wallenpaupack Creek.

2. Defendants have already secured the services of RWMS Associates of Gouldsboro, PA to design a replacement on lot sewage disposal system for their property.

3. Defendants, through their contracted consultant(s) shall complete final design documents within forty-five (45) days of the date of this agreement.

4. Defendants, through their contracted consultant(s), shall apply for any required permits from the Department of Environmental Protection, Salem Township and/or any other necessary permits within sixty (60) days of the date of this agreement.

5. Defendants shall begin construction of the replacement on lot sewage/wastewater disposal system within ninety (90) days of the date of this agreement.

6. Defendants shall complete the construction of the replacement sewage/wastewater disposal system, connect all dwellings located on Defendants property to it and have it fully operational within one hundred twenty (120) days of the date of this agreement.

7. If Defendants are unable or unwilling to construct and install a new on lot sewage/wastewater disposal system, they will cease operating the trailer court. Cessation of operating the trailer court, will be done with due diligence, in a reasonable amount of time, and in a manner allowed by law. Defendants and their family will continue to reside in the homes on the property.

8. In the event Defendants are prevented from complying in a timely manner with any time limit imposed in this Consent Order and Agreement, for circumstances beyond the control of Defendants and which the Defendants, by exercise of all reasonable due diligence, is unable to prevent, Defendants may request of the parties to this agreement extensions to the time periods. If said requests are denied, or new time periods cannot be agreed to, then any party shall be entitled to petition the Court for appropriate relief. Any decision as to the reasonableness of the Defendants actions and appropriate relief to be granted shall be the sole providence of the Court.

9. Any request by any party for fines or penalties for failure of the Defendants to meet any of the time limits imposed in this agreement shall be made to the Court. Any decision as to the appropriate penalties shall be the sole providence of the Court.

(*Id*. at ¶¶ 1-9).

18. In the COA, the Defendants agreed to pay attorneys' fees and costs incurred by the Plaintiffs in the amount of $10,000.  (Doc. 24, at ¶ 10).

19. Also in April of 2012, a "General Release", not directly related to the present action, was signed by Roy Montalvan, Louise Montalvan, William Neville, and Marlene Neville.  (Hr'g Ex., D-3).  The General Release defined the "Releasors" as "Roy Montalvan and Louise Ann Montalvan, on behalf of ourselves and our heirs, executors, administrators, successors and assigns" and defined the "Releasees" as "William Neville, Marlene Neville, and Nevilles Mobile Home Park and/or Court, its predecessors, successors, affiliates, assigns, insurers, principals, agents,

representatives, employees, attorneys, heirs, executors, administrators, successors and assigns, whether in such capacity or any other capacity." (*Id*. at 1).[3]

20. In the General Release, in consideration for the sum of $50,000, the Montalvans "acquit[ted], release[d], and forever discharge[d] [the Releasees] of and from any and all claims, demands, losses, damages, both compensatory and punitive, costs, attorney's fees, actions, and causes of actions, whether known of unknown, whether presently existing or arising in the future, whether arising at law or equity or otherwise, which [they] may have had, may now have, or may hereafter have, because of or arising out of an alleged unpermitted and unlawful discharges of untreated sewage and/or wastewater, from their property and into an unnamed tributary of Wallenpaupack Creek in Salem Township." (*Id*.).

21. The signatories to the General Release "acknowledged and specifically understood that Releasees must comply with and Releasors [Montalvans] have and maintain the right to pursue and enforce the terms of the Consent Order and Agreement signed by both the Releasors and Releasees and approved by the Court in the

---

[3] As explained in this Court's prior memorandum opinion granting Plaintiffs' motion to substitute a party, Nancy Neville Haines is the daughter of William Neville and step-daughter of Marlene Neville (Doc. 58 at 4), thus making her an "heir" for purposes of the General Release. In addition, this Court previously explained that "the creation of Neville's Mobile Home Court, LLC, [in April, 2012] is akin to a conversion of ownership to corporate form and thus a continuation of Neville's Mobile Home Park, owned and operated by William Neville and Marlene Neville, without a change in the business's identity." (*Id*. at 7). Nancy Neville Haines and named-defendant Neville's Mobile Home Court, LLC, of which Mrs. Neville is the owner, are thus both bound by the terms of the General Release. Furthermore, the definition of "Releasees" as including "Nevilles Home Mobile Home Park and/or Court" clearly contemplates that Neville's Mobile Home Court, LLC, which was approved by the Pennsylvania Department of State two days after the General Release was signed (*see id*. at 5), was intended to be included as one of the Releasees.

matter of <u>Roy Montalvan, et al. v. William Neville, et al.</u>, No. 3:11-CV-0850 (U.S.
District Court for the Middle District of Pennsylvania)." (Hr's Ex., D-3, at 2). The
parties further acknowledged that the $50,000 "may not satisfy all of the
undersigned's damages resulting from Sewage and/or Wastewater being released
into the unnamed tributary of Wallenpaupack Creek, including but not limited to past
and future property damage and diminution of property values" and thus reserved
the right of the "undersigned" to "pursue and recover all damages from any person,
firm, or entity who may be responsible for payment of such damages" with the
exception of "any of the Releasees." (*Id*.).

22. The "intention" of the General Release was "to ensure that the Releasees, with the
exception of the requirements of the . . . Consent Order and Agreement, have no
further obligation of payment to Releasors with respect to the Releasees alleged
discharge of Sewage and/or Wastewater into the unnamed tributary of
Wallenpaupack Creek." (Hr'g Ex., D-3, at 3). The General Release again stated
that it was "expressly understood that the Releasors reserve the right to pursue and
enforce the terms of the Consent Order and Agreement, pertaining to Releasees
upgrading the Sewage and/or Wastewater Treatment and Disposal System on their
property to accepted DEP standards, or ceasing to operate the trailer court and/or
park." (*Id*. at 4).

23. The General Release was "not to be considered as an admission of liability" and the Nevilles "expressly denied" any admission of liability.  (*Id.* at 3).

24. Nancy Neville is familiar with the COA and has been directly involved with all of the work performed at the mobile home park since the time of the entry of the COA in April of 2012.  (N. Neville Test., at 137).

25. The sewage system installed after the COA does not border the Montalvans' property and is located downhill from their property.  (Montalvan Test. at 44-45). (*See also*, L. Neville Test., at 68 (agreeing that the Montalvan property is uphill from the Neville Mobile Home Court)).

26. Louise Montalvan testified that after the execution of the COA, some sewage problems "abated, some got worse".  (Montalvan Test. at 12).  More specifically, "[t]he stream did not have constant sewage in it, it would, on weekends, have big pods of white, soapy bubbles going down it. The smell will come instead of directly from the stream, sometimes from the stream, not really pungent, but from their now malfunctioned on-site lot system."  (*Id.*).

27. According to Mrs. Montalvan, the sights and smell of sewage "was pretty regular[ ] for quite a while until the township started enforcing a Pump Order" in 2016. (Montalvan Test. at 13).

28. Gary Enslin has been the Salem Township Sewer Enforcement Officer ("SEO") in Wayne County, Pennsylvania since 2006.  (Enslin Test., at 71-72).  Mr. Enslin is

also the SEO for 9 other townships.  (*Id*. at 72).  Mr. Enslin's responsibilities as a

SEO are to "monitor the installations and maintenance of on-lot septics."  (*Id*.).

29. Following voir dire by the parties, Gary Enslin was accepted, without objection, by

the Court as an expert witness under Federal Rule of Evidence 702 as "an expert

witness within the scope of his license by the State of Pennsylvania as a Sewage

Enforcement Officer and Soil Scientist."  (Hr'g Tr., at 75).

30. Mr. Enslin's first interaction with the Nevilles' mobile home park was in 2008 or 2009

when he went to the property to investigate a complaint about a sewage smell in the

stream.  (Enslin Test., at 75-76).

31. In 2012, Nancy Neville applied for a permit from the Salem Township to do work on

the septic system pursuant to the agreement set forth in the COA.  (N. Neville Test.,

at 137).

32. In March, 2012, Mr. Enslin issued a permit to Neville Mobile Home Court LLC in

response to the Application for an Onlot Sewage Disposal System Permit.  (Hr'g

Ex., P-4; *see also*, N. Neville Test., at 137-138).  The Application states that Neville

Mobile Home Court was seeking to "replace tank" and "repair field."  (*Id*.).  Mr.

Enslin stated the permit was "to repair the field while waiting for the new septic

system to be put in, the new direct stream discharge to be put in."  (Enslin Test., at

77; *see also*, *id*. at 115 (agreeing that the permit was for a repair and was issued as

a temporary solution)).

33. Mr. Enslin testified that in May, 2012, he informed Mary Ellen Bentler, a branch

manager at NBT Bank that the permit approved in March, 2012, was for "repair

only".  (Enslin Test., at 78).  Mr. Enslin sent Ms. Bentler a fax stating that "[t]he only

permit issued is to add tanks and repair drainfield.  This is not a new system that

has been approved by DEP. . . ."  (Hr'g Ex., P-5).

34. William Neville, an original defendant in this matter and Nancy Neville's father, first

hired engineer Russell Williams to "design the new system" and "to submit the

plans" to Mr. Enslin as township SEO which was the subject of the work done at the

mobile home park pursuant to the permit issued in 2012.  (N. Neville Test., at 138-

139).  Russell Williams was William Neville's "first consultant, he's the one that

came in, originally, and talked it over with [Mr. Enslin and the Township] that the

Nevilles were going to be allowed a repair to help hold down the pumping while the

work was being done to put in an on-lot sewage disposal system, a direct stream

discharge." (Enslin Test. at 79).  However, Mr. Williams passed away "shortly into

the project" "so things didn't proceed."  (*Id*.).

35. After the COA was entered, work on the septic system began at the mobile home

park.  (Enslin Test., at 105).  The Neville Mobile Home Court "added more tanks",

"replaced" tanks, and replaced the drainage field.  (Enslin Test., at 119; *see also*, N.

Neville Test., at 139 (stating that the work done included "[n]ew tanks, new piping,

field was replaced. . . .")).  The majority of the work was performed in the drainage

13

field and a new drainage field was installed.  (Enslin Test., at 105; *see also*, N. Neville Test., at 139-140).  Mr. Enslin directly supervised and approved the work being done and performed inspections.  (*Id*. at 105-106, 107, 121).

36. The project took approximately three months and was completed in or about July, 2012.  (N. Neville Test., at 139, 140).

37. Mr. Enslin issued an invoice to "Neville Trailer Park" on September 27, 2012 for inspection of "repairs to existing system."  (Hr'g Ex., D-6).  The $930 invoice stated that Mr. Enslin had performed 7 inspections, the scope of which included "3 new septic tanks", "new stone and pipe installed in malfunctioning bed", and "new delivery lines from tank to bed."  (*Id*.).  All of the work listed on the invoice was done. (Enslin Test., at 107).

38. "At some point", Mr. Enslin and several agents from the Attorney General's Office in the Environmental Crimes unit, along with a local company, brought a camera and locating device to the mobile home park "to make sure that no more pipes were heading towards the stream, and . . . camera'd every pipe and located every pipe going from the tank to each individual home that's on that park."  (Enslin Test., at 119; *see also*, *id.* at 127 (stating that all of the mobile homes on the property are currently connected to the existing system)).  Nancy Neville confirmed that the township inspected the property and determined that every unit was hooked up to the system and approved the piping.  (N. Neville Test., at 140).

39. It was Nancy Neville's understanding that, following the completion of the work in 2012, the system was fully functioning. (N. Neville Test., at 141).

40. The work performed in 2012 with respect to the septic system cost approximately $135,000. (N. Neville, at 139). Mr. Enslin was not aware how much money had been spent on the septic system but agreed that $130,000 would be a reasonable price. (Enslin Test., at 121).

41. At the time the permit was issued in 2012 by Mr. Enslin, he orally told Mr. Williams, the original engineer on the septic system project, that the repair permit was only for temporary purposes. (Enslin Test., at 124). Mr. Enslin did not specifically inform "Neville Park." (*Id.*). Although Mr. Enslin "[m]ost likely" stated at Township meetings that the repair was temporary, he could not remember whether Nancy Neville or her engineers were present for any of those meetings. (*Id*. at 125-126).

42. According to Nancy Neville, she was never told by Mr. Williams, Mr. Enslin, or any other person, that the repairs or replacements to the septic system were temporary and the Township never stated that it was not going to be a long-term solution. (N. Neville Test., at 140, 141).

43. In January of 2013, Mr. Enslin conducted an inspection of Neville's Mobile Home Court with DEP officials. After reviewing the minutes from a township Board of Supervisors meeting during the hearing, Mr. Enslin testified that the mobile home

park sewage system was "[e]vidently not" fully operational and functional at that time.  (Enslin Test., at 82-83).

44. By letter dated March 20, 2013, Mr. Enslin informed Nancy Neville and William Neville that their "system is still malfunctioning and pumping is required."  (Hr'g Ex., P-7).

45. On February 13, 2012, Salem Township filed a Complaint in the Court of Common Pleas of Wayne County, Pennsylvania, against William Neville and Nancy Neville Haines "alleging an unlawful discharge of sewage effluent into an adjoining stormwater ditch leading to a clean stream" (Hr'g Ex., P-8, at ¶ 1; *see also*, Enslin Test., at 85).  As a result, a Consent Agreement was executed on March 27, 2013 by Jeffrey Treat, Solicitor for Salem Township, and Roger Mattes, Attorney for Nancy Neville Haines.  (Hr'g Ex., P-8).  The parties agreed therein that between February 13, 2012 and March 4, 2013, "Nancy Neville Haines performed various repairs to the on-lot sewage system."  (*Id*. at ¶¶ 1-3).  The Consent Agreement states that the parties "have discussed a long-term solution to" the sewage effluent coming from the sewage system "and are planning on meeting for purposes of addressing the ongoing issue."  (*Id*. at ¶¶ 4-5).  The parties thus requested that the Court in that case enter the Consent Order "specifically approving the provisions of this Agreement to provide for pumping of the holding tanks . . . until such time as a permanent alternative system is approved by the Township and the Department of

Environmental Protection and installed and approved by final inspection, or the Respondents discontinue usage of said system. . . ." (*Id*. at ¶ 9).

46. By letter dated May 17, 2013, Mr. Enslin informed William Neville and Nancy Haines that "during a resent [*sic*] inspection your system is spongy and a malfunction of the sewage bed is imminent, therefore, I am at this time requiring pumping to be done by the 28th of May and every Monday or Tuesday weekly their after [*sic*]."  (Hr'g Ex., P-9).  Referring to the state court action, the letter further noted that "this is required and mandated at this time, pursuant to the Consent agreement and Court Order approving." (*Id*.).

47. With respect to the May, 2013 letter, Mr. Enslin testified that upon his inspection, "the top of the septic bed would have been spongy, which is just a leading indicator that a malfunction could appear, so I informed them to pump to help take some of the stress off the bed."  (Enslin Test., at 90).

48. When questioned what he meant by "spongy", Mr. Enslin explained that when he would walk on the ground, it was "not firm."  (Enslin Test., at 108).  Mr. Enslin admitted that heavy rainfall would cause the ground to be spongy and "would stress the system."  (*Id*.; *see also*, *id.* at 120 (agreeing that heavy rains would adversely

affect the system and stating that "not long after [the system] was put in place, we

had, I believe, Hurricane Sandy.")[4]).

49. Mr. Enslin admitted that although his letter stated that "a malfunction of the sewage

bed is imminent", this did not occur, and agreed that he asked the Nevilles to pump

out the tanks as a precaution.  (Enslin Test., at 108-109).

50. Mr. Enslin stated that he "believe[d]" that in May 2013, a replacement fully

operational system had been installed at the Nevilles' mobile home court, explaining

that he had issued a permit in 2012 and "they did it, I believe the replacement was in

place then."  (Enslin Test., at 90-91).  Mr. Enslin agreed that a "replacement system"

had been installed, but that additional problems occurred after this installation.  (*Id.*

at 110).

51. The additional problems that arose included a perforated pipe at the bottom of the

drainage field that was installed instead of a regular pipe and a malfunctioning valve

between the upper and lower drain fields.  (Enslin Test., at 110, 120).  The

perforated pipe was thereafter replaced, and the malfunctioning valve was

corrected.  (*Id.*).  A "flaw of [the] new system" caused "an overtaxing of the newly-

installed drainage field", which was fixed.  (*Id.* at 120).  Mrs. Neville also

---

[4] The Court takes judicial notice of the fact that Hurricane Sandy occurred in late October through early November of 2012 and affected a number of East Coast states, including Pennsylvania.  Mr. Enslin did not explain, and was not asked, why the effects of Hurricane Sandy would continue to impact the mobile home park's sewage system in May, 2013, over six months later.

acknowledged that "years later" the septic system began to have problems which she corrected. (N. Neville Test., at 141-142).

52. On November 8, 2016, Gary Enslin emailed Todd Stires, his immediate supervisor at DEP, attaching "the test" that Stires requested and explaining that "[t]he reasons for this test was through my weekly check I saw some ponding ontop of the bed, in the same place as I showed you the other day."  (Hr'g Ex., P-11).  The email further stated that with respect to the holding tanks, "it is probably time" and that, in his opinion, Nancy Neville "will have no choice but to walk away from this because it will be unaffordable for her."  (*Id.*).

53. When questioned about the November 8, 2016, email, Mr. Enslin testified that the system was "under stress" and agreed that the system was not fully operational. (Enslin Test., at 93).

54. In May of 2017, the parties to the state court action, Salem Township and Nancy Neville, entered into a stipulation requiring Nancy Neville to "apply for an alternative system permit with the DEP within 30 days" and that every other Monday, Defendant would have the septic system pumped out.  (Hr'g Ex., P-12).  Mr. Enslin explained that this pumping was required "to help relieve the system during wet periods of the year."  (Enslin Test., at 96-97).

55. Mr. Enslin inspected the septic system every Monday in 2017 and stated that he did not know if the system was fully operational that year because "some Mondays I go

there and the bed might look stressed, and I have Ms. Neville pump it, and she

pumps it, and some Mondays I go there, and it looks fine."  (Enslin Test., at 97).

However, Mr. Enslin testified that the pumping agreed to in the May, 2017,

stipulation was "[m]ost likely" required because the system was malfunctioning at

that time.  (*Id*. at 97).

56. Mr. Enslin testified that the septic system "was put in as a temporary fix to help so

[Mrs. Neville] did not have to pump all the time until the time a new direct stream

discharge could be put in." (Enslin Test., at 97-98).  Mr. Enslin stated that this "new

direct stream discharge" system was the subject of the "alternative system permit"

referenced in the May, 2017, Stipulation between Salem Township and Nancy

Neville.  (Enslin Test., at 98).

57. The alternative system permit would authorize direct wastewater discharge.  (Enslin

Test., at 98).  Permitting a direct stream discharge is not within the scope of the

Township's authority and the DEP handles that program.  (Enslin Test., at 98).  At

the time of the hearing before this Court, although an application had been made to

the DEP for approval, the application was still under review by the agency and

therefore had not yet been installed by the motor home park. (Enslin Test., at 98,

111, 128; *see also*, N. Neville Test., at 142-143).  Mr. Enslin described this

"permanent solution" as a "sewage treatment plant that's going to discharge the

finished product to the stream."  (Enslin Test., at 115).  Otherwise stated, this

alternative on-lot sewage system would treat the trailer park effluent from the

discharge and, after treatment, discharge it into the stream.  (*Id.* at 128-129).

58. Mrs. Neville explained that she had applied for a permit for a new "stream

discharge" system because she wants to expand the mobile home park.  (N. Neville

Test., at 142, 147).  However, she stated that she is not going to be able to expand

because she "can only have 36 units, because it's a high quality watershed."  (*Id*. at

144, 147). When questioned why she needed a new system if she could not expand

the mobile home park, Mrs. Neville responded "[b]ecause of all [Louise Montalvan's]

complaining."  (*Id*. at 145).

59. Nancy Neville hired Doug Smith as the engineer "[f]or the new system" in mid-to-late

2018. (N. Neville Test., at 138, 145).

60. In June, 2018, Michael Ferrence, assistant counsel at the Department of

Environmental Protection, sent an email to Mrs. Montalvan.  (Hr'g Ex. D-1).[5]  In part,

the email stated that "I believe some samples have been taken recently as well.

The water samples do not indicate that there are wasted water constituents in the

stream."  (Hr'g Tr., at 113).  At the hearing, Mr. Enslin agreed that this "was the

finding of the testing lab."  (*Id*.).  The email further stated that "it is the township's

position, based upon visual inspection and sampling, that Neville's system is not the

---

[5] This Exhibit was not admitted into evidence at the hearing, and therefore the Court only
references those portions which were read at the hearing and to which Mr. Enslin, who was cc'd on the
email, stated he agreed.

cause of the water that was flowing on your neighbor's property." (*Id*.).  Mr. Enslin also agreed with this statement.  (*Id*. at 114).

61. Mr. Enslin was copied on the email from Mr. Ferrence and agreed that the statements in the email accurately reflected his position on the matter.  (Enslin Test., at 114).

62. Pumping of the sewage system was always timely done by Nancy Neville when Mr. Enslin requested that it be done.  (Enslin Test., at 101, 107).

63. Mrs. Montalvan testified that, as of the time of the hearing, the most recent incident was in June, 2019, when she saw "white pods" running down the driveway of her neighbor Linda Neville and she could smell "effluent through [her] car doors when [she] was coming home from work."  (Montalvan Test. at 13).  Linda Neville confirmed the occurrence of this incident.  (L. Neville Test. at 66).

64. Linda Neville, whose property is "[m]aybe about 200 feet" from the Montalvans' property, testified that the "sewage discharge for the trailer park borders [her] property."  (L. Neville Test., at 65).  Linda Neville first became aware of the "discharge", which she defined as a smell, when the mobile home park "started putting the septic system in."  (*Id*. at 65-66; *see also*, *id*. at 68 (stating that she "can smell the sewage" but "can't prove that there's a discharge, other than that there was soap suds in [her] driveway in early June.")).

65. Mr. Enslin testified that he has tested the ditch line before Linda Neville's property and "at times, it tested positive there for sewage, and, at times, in the past, in the most recent past, it has not."  (Enslin Test., at 116).

66. Mrs. Montalvan testified that the repeated incidents impacted her as follows:

> We would constantly look to make sure that the stream didn't have any raw sewage or if it really smelled or we would have to monitor it, take pictures. You could, if you were sleeping at night and you smelled sewage, you would get up and close your windows, you couldn't keep your windows open, or if you were barbequing on the deck, you would smell it, you would go in the house, you would not want to be outside during that time. It also impacted me because you can't sell your home if you have any kind of sewage discharge or you have to disclose it, and in disclosure, you lose the value of your home.

(Montalvan Test. at 15).

67. When asked whether she had any proof that Defendant's septic system is not functioning, Mrs. Montalvan testified that they had "spent the last several years going through several agencies; the township, the DEP and even the Attorney General's Office."  (Montalvan Test. at 41).  Mrs. Montalvan further stated that "over the years", Plaintiffs have notified Gary Enslin of the "smell that comes over the property" and that "[t]he smell from the stream, that is not a clean stream, it smells like effluent on and off, . . .  or a visual oil slick across the stream, when it would smell."  (*Id*. at 42).

68. Mr. Enslin testified that, as of the date of the hearing in September of 2019, the mobile home park's sewage system was "operational with the assistance of occasional pumping."  (Enslin Test., at 101, 109).  He further opined that the

wastewater discharge system that Mrs. Neville has applied for "will alleviate the need for the whole system, it will then take over handling the sewage from the mobile home park."  (Enslin Test., at 101).

69. Nancy Neville testified that she has no prior knowledge or training with regards to septic systems and abided by everything that her experts and the SEO told her to do.  (N. Neville Test., at 143-144).

70. Louise Montalvan admitted that she did not seek Court intervention for any alleged violations of the COA until the filing of the Motion for Contempt in March of 2017. Mrs. Montalvan stated that she watched the construction of the sewage system and objected to the Township and spoke with the DEP.  Although she believed the defendants were in breach of the COA "[w]hen the smell continued" and "never stopped", she "came back to the Court" after "everything else failed."  (Montalvan Test. at 49-50).

71. "[R]ight after" the COA was signed in 2012, the Montalvans listed their property for sale for approximately $389,000.  (Montalvan Test. at 16).  The property was listed for sale for six months but, according to Mrs. Montalvan, she did not renew the contract with the real estate agent because "it failed and it was in the stream again." (*Id*. at 16-17).

72. Once "it was quiet again", the Montalvans listed the property for sale again for approximately $349,000-$369,000.  The property was listed for sale for six months.

Mrs. Montalvan could not remember what year the property was listed.[6]  However, during this period of time, the Montalvans "started noticing white pods on the weekends in the stream and having some remnants of smell."  (Montalvan Test. at 17-18).

73. Mrs. Montalvan stated that she had two prospective buyers for the property the second time it was listed.  (Montalvan Test. at 18-19).  One prospective buyer made an offer of $200,000. Mrs. Montalvan testified that in her opinion, the sale did not occur "[d]ue to [Plaintiffs'] current situation with the stream and the trailer park not having a functioning system."  (*Id*. at 20-21).

74. The Montalvans filed for bankruptcy in the Middle District of Pennsylvania Bankruptcy Court in March of 2017. (Montalvan Test. at 35-36).

75. The Montalvans' property was foreclosed on and a Sheriffs' Sale took place on June 12, 2019.  (Montalvan Test. at 15).

76. Following the Montalvans' filing for bankruptcy, but prior to the Sheriff's Sale, two individuals contacted the Montalvans with respect to buying their property.  One individual offered to "short sell" their property and another individual asked if they had "any interest in selling".  (Montalvan Test., at 36-37; Hr'g Ex., D-2).  Mrs. Montalvan did not pursue either offer.  (*Id*.).

---

[6] Although Mrs. Montalvan testified that she could not remember what year the property was re-listed, later in the hearing, she identified an email that she had received from her realtor at that time dated January 24, 2014 (Montalvan Test., at 23-24), thus leading to a reasonable conclusion that the property was again listed for sale in late-2013/early-2014.

77. At the time of the foreclosure, the Montalvans had not made a mortgage payment in

   eight years, since in or about 2009, and the amount due on the Montalvans'

   mortgage was $270,000.  (Montalvan Test. at 24, 32, 61-62).

78. Mrs. Montalvan repeatedly testified that she and her husband needed to sell their

   home because they could not afford the home and the mortgage payments.

   (Montalvan Test. at 32, 34, 59, 62). However, Mrs. Montalvan testified that they

   could not sell the home "with the pollution problems going on." (*Id.* at 32).

79. The Montalvans moved to a new home in Lake Ariel, Pennsylvania, in August or

   September of 2019.  (Montalvan Test. at 6).

### B. Conclusions of Law

1. "A consent decree is a hybrid of a contract and a court order. A decree embodies

   the agreement of the parties and as such is in some respects contractual in nature;

   however, a decree is also in the form of a judicial order that the parties expect will

   be subject to the rules generally applicable to other judgments and orders."  *Holland*

   *v. N.J. Dep't of Corr.*, 246 F.3d 267, 277 (3d Cir. 2001).

2. A district court possesses the inherent power to enforce compliance with its consent

   decrees.  *Holland*, 246 F.3d at 270, 281-282.  Thus, until parties to a consent

   decree "'have fulfilled their express obligations, the court has continuing authority

   and discretion – pursuant to its independent, juridical interests – to ensure

compliance.'" *Id*. at 283 (quoting *United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 69 (2d Cir. 1995)).

3.  Because consent decrees "have many of the attributes of contracts," they should be interpreted "with reference to traditional principles of contract interpretation." *United States v. N.J.*, 194 F.3d 426, 430 (3d Cir. 1999).

4.  Although interpretation of a consent decree is governed by principles of contract law, the enforcement of a consent decree or agreement is subject to the Court's inherent power under principles of equity. *See e.g. United States v. V.I.*, 363 F.3d 276, 290 (3d Cir. 2004)(""[A] consent decree. . . , by its very nature, vests the court with equitable discretion to enforce the obligations imposed upon the parties.'") (quoting *Local 359, United Seafood Workers,* 55 F.3d at 69). *See also, Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) ("From the standpoint of interpretation a consent decree is a contract, but from the standpoint of remedy it is an equitable decree. And so if it is violated the injured party must ask the court for an equitable remedy. The remedy might be a contempt judgment, . . . but more commonly . . . it is a supplementary order (preferred as less condemnatory than a judgment of contempt . . .). Even if compensatory in purpose and effect, it is, we emphasize, an *equitable* order, and therefore subject to the usual equitable defenses.") (collecting cases) (internal citations omitted); *Brennan v. Nassau Cty.*, 352 F.3d 60, 63 (2d Cir. 2003) (finding that the district court "should have applied the equitable doctrine of

laches to [Plaintiff's] claims because consent decrees are subject to equitable defenses and not legal defenses such as the statute of limitations."); *Bergmann v. Michigan State Transp. Comm'n*, 665 F.3d 681 (6th Cir. 2011).

5. "Proof of contempt requires a movant to demonstrate '(1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order.'" *F.T.C. v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010) (quoting *Marshak v. Treadwell,* 595 F.3d 478, 485 (3d Cir. 2009); *Roe v. Operation Rescue,* 919 F.2d 857, 871 (3d Cir. 1990)).  The moving party must prove the three elements by "clear and convincing" evidence, "and ambiguities must be resolved in favor of the party charged with contempt."  *Id*. (quoting *John T. v. Del. Cnty. Intermediate Unit,* 318 F.3d 545, 552 (3d Cir. 2003)).  *See also*, *In re AGR Premier Consulting*, 550 F.App'x 115, 116 n.1 (3d Cir. 2014) ("In evaluating a contempt motion, ambiguities in the record are to be resolved in favor of the party charged with contempt. . . . Thus, while the facts are largely undisputed, where we discern ambiguity we consider the facts from [the non-movant's] perspective.")

6. Evidence is "'clear and convincing' when it produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in

issue." *Jones v. Brown*, 425 F.App'x 93, 96 (3d Cir. 2011) (internal quotation marks and brackets omitted).

7. An alleged contemnor's behavior need not be willful in order to contravene the applicable decree, and therefore good faith is not a defense to the elements of civil contempt. *Lane Labs-USA, Inc.*, 624 F.3d at 582  (citing *John T.*, 318 F.3d at 552; *Harley-Davidson, Inc. v. Morris,* 19 F.3d 142, 148-149 (3d Cir. 1994); *Robin Woods Inc. v. Woods,* 28 F.3d 396, 399 (3d Cir. 1994)).  *See also*, *Lane Labs-USA*, 624 F.3d at 590 n.18 ("an alleged contemnor may not invoke its good faith efforts as a *defense on the elements* of civil contempt.") (emphasis in original).

8. Nonetheless, "courts should hesitate to adjudge a defendant in contempt when there is ground to doubt the wrongfulness of the conduct."  *Lane Labs-USA*, 624 F.3d at 582 (internal quotation marks omitted).

9. In the present case, the first two elements necessary to establish that a party is in civil contempt are not in dispute: first, a valid order of the court, i.e. the 2012 COA, exists, and second, the defendant had knowledge of that order. (*See* Hr'g Tr., at 87 (Court explaining, without objection, that first and second elements are not in dispute); Doc. 84, at 2; N. Neville Test., at 137 (stating that she is the owner of the mobile home park, is familiar with the 2012 COA, and has been directly involved with all of the work performed on the property since the time of the COA)).  Thus, at issue is only whether the defendant disobeyed the COA.

10. In this case, the provisions of the COA that are directly applicable to this Court's

analysis as to Defendant's alleged contempt are paragraphs B, D, E, and F,

together with the "Corrective Action" section (*see* Doc. 24, at 3-5), the relevant

portions of which are quoted herein, *supra*, in the Court's "Findings of Fact."

11. As set forth in the COA:

> The parties to this lawsuit agree the issues to be resolved by this Consent
> Order and Agreement are the replacement of Defendants' malfunctioning on-
> lot sewage and wastewater disposal system; the connection of all homes,
> mobile homes and travel trailers and other wastewater producing structures
> ("dwellings") located on Defendants' property to the new on lot sewage and
> wastewater disposal system; and the abatement of the unlawful discharge of
> sewage and wastewater from the Defendants' collection and disposal
> systems onto Plaintiffs' property and into a tributary of Wallenpaupack Creek.

(Doc. 24, ¶ B).

12. The parties further agreed, in the "Corrective Action" section, that:

> Defendants shall complete the construction of the replacement sewage/
> wastewater disposal system, connect all dwellings located on Defendants
> property to it and have it fully operational within one hundred twenty (120)
> days of the date of this agreement.

(*Id.* at ¶ 6).

13. Plaintiffs do not assert that Defendant has breached the entire COA or that

Defendant has not complied with every obligation set forth therein.  Rather, Plaintiffs

focus on Defendant's purported failure to comply with the COA in so far as

"Defendants have not installed a functioning permanent sewage system."  (Doc. 77,

at 11).  Plaintiffs assert that, pursuant to the COA, a new sewage system was to be

installed by August 22, 2012, and "to date, a new on lot sewage and wastewater disposal system has not been installed on Defendants' property." (*Id.*). (*See also*, Pls.' Post-Hr'g Br., Doc. 84, at 2-8; *id.* at 8 ("As a result of their failure to install a fully operational system prior to the expiration of the 120-day deadline and the continued malfunctioning resulting from that failure, the Defendants have disobeyed the COA and the third element of contempt has been satisfied.")).

14. The Court begins its analysis of Plaintiffs' argument by first turning to Defendant's assertion in its post-hearing brief that the COA was "vague and ambiguous" because "[i]t did not have any definitions of the terms it used including what constitutes a 'replacement sewage/wastewater disposal system.'" (Doc. 85, at 4).[7]

15. In evaluating Defendant's argument, the Court applies the law governing the interpretation of contracts to the COA. *See United States v. N.J.*, 194 F.3d at 430.

16. "[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971). Thus, "[a] court should interpret a consent decree as written and should not impose terms when the parties did not agree to those terms." *Holland*, 246 F.3d at 281 (citing *Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 319 (3d Cir.1990)). A court's "task is not to

---

[7] Notably, despite arguing that the COA was vague and ambiguous in not defining "replacement" and "new", and thus that Defendant cannot be held in contempt for not installing a "new" system, Defendant also repeatedly insists that Mrs. Neville did actually install "a new replacement system." (*See e.g.*, Doc. 85, at 4, 5, 6, 8, 9, 11).

reveal the subjective intention of the parties but what their words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used." *Halderman*, 901 F.2d at 319 (internal quotation marks and brackets omitted).  *See also*, *In re Lipitor Antitrust Litigation*, 868 F.3d 231, 265 (3d Cir. 2017) ("when parties seek to enforce agreements adopted in consent orders, courts construe terms of the settlement based on the intent of the parties, not of the court."); *Harris v. City of Philadelphia*, 137 F.3d 209, 212 (3d Cir. 1998) (when examining the language of a consent decree, a court "must not strain the decree's precise terms or impose other terms in an attempt to reconcile the decree with [a court's] own conception of its purpose.").

17. When interpreting a consent decree, the Court's first task is to determine "whether its terms unambiguously cover the dispute in question."  *United States v. N.J.*, 194 F.3d at 430.  Upon identifying the contractual language at issue, the Court must determine whether the language "is ambiguous in light of the context in which the decree was signed and the specialized meaning of any words used." *Id.*  A provision in a consent decree "is ambiguous only when, from an objective standpoint, it is reasonably susceptible to at least two different interpretations."  *Id.*

18. "[R]esort to extrinsic evidence is permissible, but only when the decree itself is ambiguous, although circumstances surrounding its formation are always relevant to its meaning."  *United States v. N.J.*, 194 F.3d at 430.

19. Here, the COA was signed in the context of resolving the above-captioned action, and specifically to resolve the following issues: (1) "<u>replacement</u> of Defendants' malfunctioning on-lot sewage and wastewater disposal system;" (2) "the connection of all homes, mobile homes and travel trailers and other wastewater producing structures ('dwellings') located on Defendants' property to the <u>new</u> on lot sewage and wastewater disposal system"; and (3) "the abatement of the unlawful discharge of sewage and wastewater from the Defendants' collection and disposal systems onto Plaintiffs' property and into a tributary of Wallenpaupack Creek."  (Doc. 24, ¶ B) (underline added).  The purpose of this COA was to address "the problem of the malfunctioning of [Defendants'] on lot sewage and wastewater disposal system and the unlawful discharge onto the Plaintiffs' property and into a tributary of Wallenpaupack Creek."  (*Id.* at ¶ C).

20. The COA alternates between defining the on-lot sewage system to be installed as a "replacement" of the malfunctioning system (*see* Doc. 24, ¶¶ B, 2, 5, 6) and as a "new" sewage and wastewater system (*see id.* at ¶¶ B, D, E, F, 7).

21. The "Background" of the COA repeatedly references a "new" on lot sewage and wastewater system (*see* Doc. 24, at ¶¶ B, D, E, F).  The parties to the COA also agreed in both the "Background and "Corrective Action" portions of the COA that "if a *new* on lot sewage and wastewater disposal system is not, or cannot, be installed

on the property . . . Defendants will cease to operate the trailer court . . ." (*See id*. at

¶¶ F, 7) (emphasis added).

22. The "Background" of the COA references "the replacement of Defendants'

malfunctioning" system (Doc. 24, at ¶ B), while the "Corrective Action" repeatedly

mandates the "replacement" of the sewage system (*id*. at ¶¶ 2, 5, 6).

23. The word "replacement" is exclusively used in the COA in the singular, clearly

contemplating one replacement of the entire system, and not a series of

replacements of one or more components of the existing sewage system.

24. Here, the terms of the COA, and specifically the parties' alternating uses of the

words "new" and "replacement", are not ambiguous.  When examined from an

objective standpoint, the use of these terms is not reasonably susceptible to at least

two different interpretations, *see United States v. N.J.*, 194 F.3d at 430.  Rather, the

terms as set forth in the COA mandate the same result, and it is clear that the intent

of the parties, as reflected in the COA, was that an entirely new sewage system,

which would replace the system in place at the time of the COA's signing, would be

installed by the Defendant, and not simply portions of the existing system.

25. Having found that the terms "replacement" and "new" in the COA are, in this case,

synonymous and not capable of differing interpretations as alleged by Defendant,

the Court turns to Plaintiffs' specific assertions of contempt.

26. Plaintiffs have produced clear and convincing record evidence that Defendant did not install a "new" or "replacement" sewage system and that the existing system, despite any repairs by Defendant, was not fully-functional.

27. The testimony of Mr. Enslin reflects that almost immediately following the entry of the COA, the Neville Mobile Home Court added more tanks, replaced tanks, and replaced the drainage field, and that following these replacements, he verified that all dwellings on the mobile home property were connected to the septic system. These findings are further confirmed by the testimony of Nancy Neville.

28. However, despite the afore-mentioned repairs, as specifically noted by Mr. Enslin in a fax in May, 2012, "[t]he only permit issued is to add tanks and repair drainfield. *This is not a new system that has been approved by DEP. . . .*"  (Hr'g Ex., P-5) (emphasis added).  (*See also*, Hr'g Ex., P-4)(permit issued by Mr. Enslin to Neville Mobile Home Court LLC in March, 2012, in response to an Application for an Onlot Sewage Disposal System Permit stating that Neville Mobile Home Court was seeking to "replace tank" and "repair field.").

29. This Court's finding that a new or replacement system was not installed in 2012 is further supported by Mr. Enslin's invoice to "Neville Trailer Park" on September 27, 2012 for inspection of "repairs to *existing* system" (Hr'g Ex., D-6) (emphasis added).

30. Mr. Enslin also testified that the 2012 permit issued by the Township was "to repair the field while waiting for the new septic system to be put in, the new direct stream

discharge system to be put in."  (Enslin Test., at 77).  Mr. Enslin later explained that this system "was put in as a temporary fix to help so [Mrs. Neville] did not have to pump all the time until the time a new direct stream discharge could be put in." (Enslin Test., at 97-98).

31. In addition, in the Consent Agreement entered into between Salem Township and William Neville and Nancy Neville and executed in March, 2013, the parties agree that, between February 2012 and March 2013, Mrs. Neville "performed various *repairs* to the on-lot sewage system."  (Hr'g Ex., P-8, at ¶ 3)(emphasis added).  The Consent Agreement further states that the parties "have discussed a long-term solution to said sewage issue" and requests that the Court enter the Consent Order approving the Agreement with respect to pumping set forth therein "until such time as a permanent alternative system is approved by the Township and the [DEP] and installed and approved by final inspection or the Respondents discontinue usage of said system. . . ." (*Id*. at ¶¶ 5, 9).  This Agreement confirms that, as of March 2013, Mrs. Neville was in breach of the COA at issue in this case as she had admittedly only made "repairs to the on-lot sewage system" and had not yet implemented any "long-term solution" to certain sewage issues.

32. The Court further finds that Plaintiffs have shown by clear and convincing evidence that the sewage system, even with the undisputed repairs, was not fully functioning.

33.  The findings that the sewage system was not fully functioning through the date of the 2019 hearing before this Court and that a long-term solution was not timely implemented, and has yet to be implemented, is evidenced by a number of exhibits admitted at the hearing, as well as through the testimony of several witnesses.

34. The fact that the system was not fully functioning even after Mrs. Neville's repairs in 2012 is evidenced by Mr. Enslin's letter dated March 20, 2013, to Nancy Neville and William Neville stating that their "system is *still* malfunctioning and pumping is required," (Hr'g Ex., P-7) (emphasis added), a statement clearly signifying that the system had been repeatedly malfunctioning prior to March, 2013 and continued to do so.

35. In addition, on May 17, 2013, Mr. Enslin informed William Neville and Nancy Neville that "a malfunction of the sewage bed is imminent" (H'rg Ex., P-9).

36. It is also undisputed that the sewage system experienced problems at some time between 2012 and 2019 in the form of a perforated pipe and a malfunctioning valve.

37. Mr. Enslin's testimony, as well as several documents admitted into evidence at the hearing, further demonstrate that the mobile home's sewage system was repeatedly "under stress" from 2012 to 2019.  (*See* Enslin Test., at 93, 97, 108, 120; Hr'g Ex., P-9; Hr'g Ex., P-11).

38. As of November of 2016, "effluent" was still ponding as a result of the mobile home sewage system.  (*See* Hr'g Ex., P-11).  Furthermore, according to Mr. Enslin, even

by 2017 he could not say whether the system was fully operational because on "some Mondays" when he would go to the mobile home park "the bed might look stressed" and he would have to direct Mrs. Neville to pump it, but on other Mondays, "it looked fine."  (Enslin Test., at 97).

39. Despite the Consent Agreement between Salem Township and the Nevilles, it was not until May, 2017, that those parties entered into a stipulation requiring Mrs. Neville to apply for "an alternative system permit with the DEP within 30 days." (Hr'g Ex., P-12).  This is further evidence that no new system had been installed, or even applied for, prior to mid-2017.  At that time, those parties further agreed that Defendant would need to continue pumping the system every other Monday (*id*.), demonstrating that the system in place at the mobile home park continued to not be fully functional without additional help.

40. As a result of the afore-stated findings, including the continued presence of effluent and "spongy" ground, the repeated statements by Mr. Enslin that the system was malfunctioning or that a malfunction was imminent, the pumping that Mrs. Neville was ordered to regularly do in order to "help relieve the system during wet periods of the year", and the agreement between Mrs. Neville and the Township that a new system – the "alternative system" – would be applied for, the Plaintiffs have demonstrated by clear and convincing evidence that no new system was installed and that the existing system was repeatedly malfunctioning after 2012.

41. Thus, even if this Court were to accept Defendant's invitation to find that

Defendant's repairs to the existing system were sufficient to constitute a

"replacement" system, for the reasons set forth above, Plaintiffs have also

demonstrated by clear and convincing evidence that the system in place through the

date of the hearing was not "fully operational."  Here, the COA only specifically

references a "fully operational" system once. (*See* Doc. 24, ¶ 6)("Defendants shall

complete the construction of the replacement sewage/wastewater disposal system,

connect all dwellings located on Defendants property to it and have it fully

operational within one hundred twenty (120) days of the date of this agreement.").

Nonetheless, an agreement that the system must be fully operational is necessarily

implied in the repeated references to the need for a "new"/"replacement" system, as

well as the Defendant's admission that, at the time of the execution of the COA in

2012, their system was "malfunctioning" (Doc. 24, ¶¶ B, C).[8]

42. Consequently, even when considering the facts in the light most favorable to the

Defendant where this Court has discerned any ambiguities, Plaintiffs have

established by clear and convincing evidence that Neville's Mobile Home Court,

LLC, is in contempt by failing to install a new sewage system within the time frame

set forth in the COA, and that the defendant's existing sewage system continued to

---

[8] Regardless, in light of this Court's finding that Defendant is in contempt for failing to install a new sewage system, pursuant to the language of the COA quoted herein (Doc. 24, ¶ 6), by failing to install the "replacement sewage/wastewater system", the defendant necessarily failed to have that system fully operational within the prescribed time limit.

not be fully functional after 2012 and up to the date of the hearing in 2019.  Plaintiffs

further established that, at the time of the hearing in 2019, Defendant had still not

complied with the terms of the COA by installing a new system.

43.  In its post-hearing brief, Defendant, for the first time, asserts the defense of

impossibility.  (*See* Doc. 85, at 4-5).[9]

44.  "There is general support for the proposition that a defendant may not be held in

contempt as long as it took all reasonable steps to comply." *Harris v. City of*

*Philadelphia*, 47 F.3d 1311, 1324 (3d Cir. 1995).

> The impossibility defense necessarily requires the defending party to assert
> a present inability to comply with the relevant court order.  It refers to physical
> impossibility beyond the control of the alleged contemnor. Such an assertion
> will naturally precipitate judicial inquiry into the feasibility of the defendant's
> compliance. Thus, a tribunal that concludes that contempt is excused on
> grounds of impossibility is essentially declaring that the defendant was
> incapable of compliance in spite of his or her best efforts.

*Lane Labs-USA*, 624 F.3d at 590 (internal citations and quotation marks omitted).  In

establishing a defense of impossibility, "the burden is that of the defendant to

---

[9] Defendant haphazardly sets forth law addressing contempt (*see* Doc. 85, at 2-5), much of which incorrectly cites to Pennsylvania law for issues where federal law would apply, but fails to incorporate this law into any substantive argument.  Nonetheless, the Court will address the defense of impossibility, as Defendant appears to assert this defense.  In addition, several of Defendant's case citations reference "good faith" efforts, and therefore the Court, liberally construing Defendant's submission, will briefly address the defense of substantial compliance, *infra*.  With the exception of the previous defenses previously asserted by Defendant – accord and satisfaction, laches, and standing – Defendant has not set forth with any clarity any other possible defenses to contempt and therefore the Court declines to address any other defense which may have been available to Defendant when determining whether Defendant may be held in contempt.

introduce evidence beyond 'a mere assertion of inability,' and to show that it has

made 'in good faith all reasonable efforts to comply.'" *Harris*, 47 F.3d at 1324.

45. Defendant's assertion of impossibility fails.  Defendant argues that "Plaintiffs'

expectations of what the consent agreement required wasn't even possible, let

alone a reasonable interpretation given the stated time restrictions [and i]n order to

show contempt of court, there needs to be a showing that compliance with the court

order was possible."  (Doc. 85, at 4).

46. Here, Mr. Enslin testified that the normal application process period to the DEP is

1.5-2 years.  (Enslin Test., at 111, 128).  Accepting this statement as true, Mrs.

Neville could not have complied with the terms of the COA requiring that

construction "of the replacement on lot sewage/wastewater disposal system"

commence within 90 days of the date of the agreement and be completed within

120 days of the date of the agreement (*see* Doc. 24, ¶¶ 5, 6).

47. However, Defendant did not make any reasonable efforts to comply with the COA.

As this Court has noted, Mrs. Neville undisputedly made repairs to the existing

sewage system, including replacing tanks and enlarging the drainage system.  Mrs.

Neville testified that her father had hired an engineer, Russell Williams, "to submit

the plans" to Mr. Enslin as Township SEO and to "design the new system" that was

installed at the mobile home park pursuant to the permit issued in 2012.  (N. Neville

Test., at 138-139).  According to Mr. Enslin, Russell Williams "came in, originally,

and talked it over with [Mr. Enslin and the Township] that the Nevilles were going to be allowed a repair to help hold down the pumping while the work was being done to put in an on-lot sewage disposal system, a direct stream discharge."  (Enslin Test. at 79).  Because Mr. Williams passed away "shortly into the project", "things didn't proceed."  (Enslin Test., at 79).  Thus, a new system – the direct stream discharge – was contemplated by the Nevilles' engineer in 2012 but was never completed due to Mr. Williams' death.  However, Mrs. Neville testified that she only hired Doug Smith as the engineer "[f]or the new system" in mid-to-late 2018. (N. Neville Test., at 138, 145).  Defendant presented no evidence that Mrs. Neville made any effort between 2012 and 2017 to hire a new engineer to design the new system or apply for required permits in order to attempt to comply with the terms of the COA.

48. Thus, despite the clear language of the COA, which required the completion of "final design documents", application for permits from the DEP, Salem Township, and any other necessary entity, all within a specified amount of time, the record evidence unequivocally demonstrates that in 2012, Mrs. Neville only applied for a permit from the Township to "repair field" and "replace tank", and Defendant has submitted no evidence that she submitted any "final design documents", or permits for the construction of any new system pursuant to those design documents, to the

Township or DEP prior to 2017, or that Mrs. Neville even hired an engineer for the new system prior to 2017.

49. In addition, the COA specifically provides a remedy for any impossibility in meeting the deadlines set forth in the COA due to a circumstance such as the waiting time for approval of a permit from the DEP.  Pursuant to the COA,

> In the event Defendants are prevented from complying in a timely manner with any time limit imposed in this Consent Order and Agreement, for circumstances beyond the control of Defendants and which the Defendants, by exercise of all reasonable due diligence, is unable to prevent, Defendants may request of the parties to this agreement extensions to the time periods. If said requests are denied, or new time periods cannot be agreed to, then any party shall be entitled to petition the Court for appropriate relief. Any decision as to the reasonableness of the Defendants actions and appropriate relief to be granted shall be the sole providence of the Court.

(Doc. 24, ¶ 8).  Here, Defendant did not request any extension of the time period to comply with the COA from either the Plaintiffs or this Court.

50. Thus, despite the time it may take to have a permit approved by the DEP, Defendant did not make "best efforts" or, at minimum, good faith efforts, to comply, where she (1) did not hire a new engineer to design the new sewage system until 5 years after the COA was signed; (2) did not apply for any permits with the DEP until at least 2017; and (3) did not request an extension of time from Plaintiffs or this Court to complete the new project.

51. As a result, the Court cannot find that Defendant was incapable of compliance in spite of its best efforts, *Lane Labs-USA*, 624 F.3d at 590, and therefore that the defense of impossibility applies to the defendant in this case.

52. In response to a motion for contempt, the non-moving party may also assert a defense of substantial compliance.

> In order to avail oneself of the defense, a party must show that it (1) has taken all reasonable steps to comply with the valid court order, and (2) has violated the order in a manner that is merely "technical" or "inadvertent." The District Court's application of the appropriate test for substantial compliance is a legal issue to be reviewed de novo. *See Anderson v. City of Phila.,* 845 F.2d 1216, 1220 (3d Cir. 1988). Whether the alleged contemnors took all reasonable steps to comply with the court order, and the extent to which contumacious conduct constitutes a "technical" or "inadvertent" violation, are factual questions subject to review for clear error. Resolution of these questions will naturally depend upon the unique facts of each case, the nature of the conduct precluded, and the capabilities of the parties subject to the order.

*Lane Labs-USA*, 624 F.3d at 591. Otherwise stated, "[a] party substantially complies when it takes all reasonable steps to do so, but nonetheless contravenes the court order by good faith mistake or excusable oversight. . . . [A] party that substantially complies is physically capable of doing so; it has simply erred in a manner for which it would be inequitable to impose contempt sanctions." *Id.* at 590-591. The party asserting the defense has the burden "to introduce evidence beyond a mere assertion of inability, and to show that it has made in good faith all reasonable efforts to comply." *Harris*, 47 F.3d at 1324 (internal quotation marks omitted).

53. Although good faith is not a defense to the elements of civil contempt, "[w]hen assessing the *affirmative defense* of substantial compliance, however, good faith efforts inherently factor into the inquiry." *Lane Labs-USA*, 624 F.3d at 590 n.18 (emphasis in original).  Nonetheless, a party's good faith efforts do not "necessarily convert its contumacious conduct into inadvertent violations; rather, good faith is relevant to the substantial compliance inquiry, no more, no less." *Id.*

54. Although Defendant here does not specifically assert the affirmative defense of substantial compliance, the Court considers this defense in light of the actions taken by Nancy Neville to make repairs to the existing sewage system.

55. The Court first turns to whether Defendant has established that it "has taken all reasonable steps to comply with the valid court order." *Lane Labs-USA*, 624 F.3d at 591.

56. Here, it cannot be said that Defendant took all reasonable steps to comply with the Court's order.  As previously noted in rejecting Defendant's defense of impossibility, although Mrs. Neville performed repairs to the existing system, she did not take any steps to "complete final design documents", "apply for any required permits" or begin, and thus complete, construction of the "replacement" on lot sewage system (*see* Doc. 24, ¶¶ 3-6) until 2017, approximately five years after those steps were to be taken.  More fundamentally, to date, the record reflects that no "new" or "replacement" system has been installed on the mobile home property.

57. Nor has Defendant demonstrated that any violations of the order were "in a manner that is merely 'technical' or 'inadvertent,'" *Lane Labs-USA*, 624 F.3d at 591.

58. As this Court previously explained, *supra*, the record supports a determination that Mrs. Neville, as owner of the Mobile Home Court, LLC, was aware of the COA in 2012, and was further aware that the work she had done on the sewage system constituted repairs and not the installation of a "new" or replacement system" (*see e.g.* Hr'g Ex., P-4; Hr'g Ex., P-8, at ¶¶ 3, 5, 9; Hr'g Ex., P-12, at ¶ 3; *see also*, N. Neville Test., at 137 (stating that she is the owner of the mobile home park, is familiar with the 2012 COA, and has been directly involved with all of the work performed on the property since the time of the COA)).  Thus, it cannot be said that any violation of the COA by not putting in a new sewage system was "inadvertent" or otherwise due to an oversight or unintentional inaction.  Rather, Mrs. Neville took actions which served only to make repairs to the existing system but she failed to even attempt to design or install a new system until 2017, when she signed a Stipulation with Salem Township as the result of separate litigation to apply for an alternative system permit with DEP.

59. Nor was Defendant's contempt "technical."  Rather, Defendant's failure to install a new system, or even take reasonable steps to attempt to install the system, are in clear violation of the terms of the COA.  The results from Defendant's repairs to the existing system are not significant enough to be considered "technically" similar or

identical to a new system.  Not only was the system not actually new, the system continued to malfunction even following the repairs to the system.

60. Defendant also raises four equitable defenses to Plaintiffs' motion for contempt: accord and satisfaction, the doctrine of laches, standing, and the statute of limitations (*See* Doc. 78, at 2-6; Doc. 85, at 9-13).[10]

61. As previously set forth, *supra*, although interpretation of a consent decree is governed by principles of contract law, the enforcement of a consent decree or agreement is subject to the Court's inherent power under principles of equity.  *See Cook*, 192 F.3d at 695 (an Order of contempt is "an equitable order, and therefore subject to the usual equitable defenses."); *Brennan*, 352 F.3d at 63 (district court "should have applied the equitable doctrine of laches to [Plaintiff's] claims because consent decrees are subject to equitable defenses and not legal defenses such as the statute of limitations.").

62. The Court first addresses Defendant's argument that Plaintiffs' motion for contempt is barred by the doctrine of laches.

63.  The doctrine of laches is an equitable doctrine wherein "[i]t is hornbook law that laches consists of two essential elements: (1) inexcusable delay in instituting suit, and (2) prejudice resulting to the defendant from such delay."  *Univ. of Pittsburgh v.*

---

[10] Although this Court previously denied without prejudice Defendant's defenses of accord and satisfaction, the doctrine of laches, and standing, the Court denied Defendant's affirmative defense that the action is barred by the statute of limitations with prejudice.  Thus, while Defendant again raises the statute of limitations as a defense, this Court will not address this argument.

*Champion Prod., Inc.*, 686 F.2d 1040, 1044 (3d Cir. 1982) (citing *Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1258 (3d Cir. 1974); *Sobosle v. United States Steel Corp.*, 359 F.2d 7, 12-13 (3d Cir. 1976)).  *See also*, *Marshak*, 595 F.3d at 496 n. 14.[11]

64. Defendant does not provide this Court with any case law in support of its assertion that Plaintiffs' claim is barred by the equitable doctrine of laches.[12]  However, in support of its assertion that this Court should bar Plaintiffs' claim under the doctrine of laches, Defendant argues that the "case had been closed for seven years", the original defendants and their contractor, engineers, and experts are "long gone", and that there "was some sort of supplemental agreement between the parties which no one can explain but Plaintiffs were able to get five times more money." (Doc. 78, at 4).  Defendant further argues that it is "severely prejudiced by the lapse of time Plaintiffs have taken in attempting to resurrect this case" and that "there has been no reason given for doing so, other than Plaintiff's false assertion that Defendants failed to replace the system." (*Id.* at 5).  (*See also*, Doc. 85, at 9-10).

65. Defendant's vague arguments fail to demonstrate or establish inexcusable delay by Plaintiffs in moving for contempt.

---

[11] Pennsylvania law and federal law with respect to the doctrine of laches "are identical for all practical purposes." *Univ. of Pittsburgh v. Champion Prod., Inc.*, 686 F.2d 1040, 1044 (3d Cir. 1982).

[12] Defendant fails to cite any cases addressing the doctrine of laches in its Brief in Opposition to Plaintiffs' motion for contempt (Doc. 78, at 4-5).  In its Post-Hearing Brief, Defendant only briefly cites two cases, both over 60 years old, for basic propositions related to the doctrine of laches.  (Doc. 85, at 9-10).

66. Preliminarily, despite Defendant's attempts to characterize any delay as exceeding seven years, Plaintiffs first moved to re-open this action, substitute a party, and for contempt on March 2, 2017 (*see* Docs. 26-28), a little less than five years after the COA was signed in this action.

67. Furthermore, here, Louise Montalvan testified that she watched the work done on the sewage system and both objected to the Township and spoke with the DEP. Although she admitted that she believed the defendants were always in breach of the COA, she testified that she "came back to the Court" after "everything else failed."  (Montalvan Test. at 49-50; *see also, id.* at 41-41).

68. In light of the testimony and documentary evidence admitted at the hearing, Mrs. Montalvan's explanation for waiting almost five years before requesting that this Court find Defendant in contempt for failing to comply with the terms of the COA is reasonable.

69. At the hearing, Plaintiffs presented evidence that from 2012 through 2017, Mr. Enslin regularly visited the mobile home park to conduct inspections and was occasionally accompanied by a DEP official or other official during these visits. (*See e.g.*, Enslin Test., at 119 (testifying that he, agents for the Attorney General's Office, and a local company, brought a camera and locating device to the mobile home park "to make sure that no more pipes were heading towards the stream. . . ."); *id*. at 82-82 (testifying that he conducted an inspection of Neville's Mobile Home

Park with DEP officials in January 2013 and the sewage system was "[e]vidently

not" fully operational and functional); Hr'g Exs., P-7, P-9 (demonstrating that in

March and May of 2013, Mr. Enslin conducted inspections of the property); Hr'g Ex.,

P-8 (Consent Agreement with Salem Township admitting that Mrs. Neville had

performed repairs between 2012 and March 2013 and that the parties had

discussed long term solution and agreed to allow Mrs. Neville to pump the holding

tanks until a permanent alternative solution was approved and installed); Hr'g Ex.,

P-11 (email from Mr. Enslin to Mr. Stires in 2016 stating that "through [his] weekly

check, [he] saw some ponding ontop of the bed. . ."); Enslin Test., at 97 (testifying

that he inspected the septic system every Monday in 2017)).

70. In addition, in the Consent Agreement executed on March 27, 2013, by the solicitor

for Salem Township and the attorney for Nancy Neville Haines (Hr'g Ex., P-8), the

parties agreed that between February 13, 2012 and March 4, 2013, "Nancy Neville

Haines performed various repairs to the on-lot sewage system" (*id*. at ¶¶ 1-3).  The

Consent Agreement further states that the parties "have discussed a long-term

solution to" the sewage effluent coming from the sewage system "and are planning

on meeting for purposes of addressing the ongoing issue."  (*Id*. at ¶¶ 4-5).  As a

result, the parties requested that the Court enter the Consent Order "specifically

approving the provisions of this Agreement to provide for pumping of the holding

tanks . . . until such time as a permanent alternative system is approved by the

Township and the Department of Environmental Protection and installed and approved by final inspection, or the Respondents discontinue usage of said system. . . ." (*Id.* at ¶ 9).  Thus, the Montalvans had reason to believe that the on-going issues were being addressed and that the mobile home park still intended to put in a new sewage system.

71. Mrs. Montalvan testified that she had "spent the last several years going through several agencies; the township, the DEP and even the Attorney General's Office" and that "over the years", Plaintiffs had notified Mr. Enslin of the "smell that comes over the property" and that "[t]he smell from the stream, that is not a clean stream, it smells like effluent on and off, . . .  or a visual oil slick across the stream, when it would smell."  (Montalvan Test. at 41-42).

72. The aforementioned testimony and documentary evidence demonstrate that any delay by Plaintiffs in moving for contempt was not inexcusable. Rather, Plaintiffs repeatedly attempted to remedy any issues without resorting to Court intervention. Mr. Enslin was repeatedly inspecting the property over the course of the five-year period and pumping was occurring, both of which may have reasonably led the Plaintiffs to believe that some or all of the problems would be alleviated or that Defendant was making efforts to install a fully functioning system.  In addition, the Consent Agreement between the Nevilles and the Township specifically contemplated the installation of a permanent alternative solution by the mobile home

park and that the defendant would be applying for permits from the Township and DEP for the approval and installation of this system.  Further, Mrs. Montalvan repeatedly contacted Township and State officials to voice her concerns, demonstrating a continuing attempt to resolve this situation prior to moving for contempt.

73.  Defendant has also failed to show that it will suffer prejudice as a result of the passage of time between the expiration of the applicable timeline in the COA and Plaintiffs' filing of the motion for contempt.  Defendant's generalized description of why it is prejudiced by the elapse of five years prior to Plaintiffs' filing of the motion for contempt fails to set forth any concrete or persuasive attempt to establish prejudice.  At best, here, Defendant has demonstrated that Plaintiffs *could* have filed a motion for contempt at an earlier time.  However, Defendant has not shown why it will suffer prejudice due to Plaintiffs' decision to not file for contempt until 2017. And, for the reasons set forth, *supra*, this Court has found the five-year time period to be both reasonable and excusable.

74. In addition, Nancy Neville has been aware of the COA since 2012 and has had ample opportunity to comply with the agreements therein.  She necessarily knew that the system from 2012 to the date of the hearing was not "new" as she had only made repairs to it.  Mrs. Neville was repeatedly put on notice since 2012 that the existing system had a number of problems due to the Township's lawsuit and the

Consent Agreement and Stipulation arising therefrom, Mr. Enslin's numerous visits and inspections, and Mrs. Montalvan's repeated complaints of which Mrs. Neville was aware.[13]

75. Furthermore, Mrs. Neville has now submitted final design plans, completed by an engineer, to the DEP and has applied to the DEP for a permit to install a "new" system, which she has indicated that she intends to install upon receiving approval, significantly weakening any assertion of prejudice that she may otherwise suffer as a result of this Court ordering compliance with the terms of the COA.

76. For the afore-stated reasons, Defendant's asserted defense of the doctrine of laches fails.

77. The Court next turns to Defendant's affirmative defense of accord and satisfaction.

78. "The elements of an accord and satisfaction are (1) a disputed debt, (2) a clear and unequivocal offer of payment in full satisfaction of the debt, and (3) acceptance and retention of payment by the offeree." *T.J. Trauner Assoc., Inc. v. Cooper-Benton, Inc.*, 820 F.2d 643, 645 (3d Cir. 1987).

79. Defendant fails to cite a single case in support of its assertion that the doctrine of accord and satisfaction is applicable in this case. (*See* Doc. 78, at 2-3; Doc. 85, at 10-11). Although Defendant sets forth a number of factual allegations, Defendant

---

[13] The Court's determination that Mrs. Neville was aware of Mrs. Montalvan's complaints is supported by Mrs. Neville's statement during the hearing that she needed a new system "[b]ecause of all [Louise Montalvan's] complaining." (N. Neville Test., at 145).

fails to explain how any of these factual assertions are relevant to the defense of accord and satisfaction and the elements necessary to prove this defense. (*See id*.). In light of Defendant's conclusory, unsupported, statements, this Court finds that Defendant has failed to meet its burden in establishing this defense.[14]

80. Finally, the Court addresses Defendant's assertion that Plaintiffs lack standing to pursue their claim of contempt.

81. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id*. An "'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation." *Already, LLC. v. Nike, Inc*., 568 U.S. 85, 90-91 (2013) (quoting *Alvarez v. Smith,* 558 U.S. 87, 92 (2009)).

82. "The question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975)). It is well

---

[14] The Court is skeptical that the defense of accord and satisfaction is even available to the Defendant in this case where there is no disputed "debt". Plaintiffs do not assert that Defendant did not pay the $10,000 agreed-to in the COA, but rather that Defendant did not install a new and fully functioning sewage system pursuant to the terms of the COA. To the extent that Defendant is attempting to raise the defense of accord and satisfaction as a result of the General Release, that Release does not help Defendant support a defense of accord and satisfaction where the issue here is whether that affirmative defense bars Plaintiffs' claim that the <u>COA</u> was not fully complied with.

settled that three elements must be satisfied to meet "the irreducible constitutional minimum of standing": (1) a "plaintiff must have suffered an injury in fact - an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *United States. v. Hays*, 515 U.S. 737, 742-743 (1995).

83. A plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the three elements set forth above.  *Spokeo, Inc.*, 136 S.Ct. at 1547.

84. In support of the assertion that Plaintiffs lack standing, Defendant first argues that "[s]ubsequent to the time of the filing of the Motions at bar, but prior to serving Defendants, Plaintiffs were under the protection of the Bankruptcy Court having filed for bankruptcy on or about March 21, 2017" and that Plaintiffs did not seek or obtain permission from the Bankruptcy Court "to pursue this matter."  (Doc. 78, at 5; Doc. 85, at 12).  Defendant further asserts that Plaintiffs did not "disclose the existence of this lawsuit in their Statement of Financial Affairs" and that they "did not disclose the fact that they were in bankruptcy to this Court" or opposing counsel. (Doc. 78, at 5; Doc. 85, at 12-13).  Defendant thus asserts that "[t]he lack of candor to the Bankruptcy Court borderlines on intentional perjury and should not go unnoticed by this Court."  (Doc. 78, at 5; Doc. 85, at 13).

85. Defendant fails to offer any legal authority or substantive explanation for why, or how, Plaintiffs' bankruptcy proceedings deprive them of standing in the present action.  The Court is thus without any basis to determine how any failure "to disclose the existence of this lawsuit" in Bankruptcy Court in some way impacts Plaintiffs' standing in this action or ability to pursue enforcement of the COA.  Defendant does not argue that the Plaintiffs have always lacked standing, but rather that the bankruptcy proceedings and the Plaintiffs' actions therein, in some way, divested the Montalvans of standing in this case.  As this Court previously noted, "Defendant's assertion that Plaintiffs failed to disclose the existence of the lawsuit during the bankruptcy proceedings, even if accepted as true, does not on its face appear to affect Plaintiffs' standing in this action." (Doc. 71, at 9).[15]  To the extent that Defendant believes Plaintiffs' alleged "lack of candor" should be factored into any decision by this Court, such argument is better considered when determining any sanctions to be imposed for Defendant's contempt.

---

[15] The Court must note that, with respect to each procedural defense raised by defendant, specifically the doctrine of laches, the doctrine of accord and satisfaction, and the issue of standing, Defendant's "Brief in Opposition to Plaintiffs' First Amended Motion for Contempt" (Doc. 78) is almost entirely a mere reproduction of its prior "Brief in Opposition to Plaintiffs' (Amended) Motion for Contempt" (Doc. 65).  Despite this Court addressing each of these procedural defenses in its prior Memorandum Opinion (Doc. 71) and making clear that for Defendant to succeed on any of these defenses, it would necessarily have to include applicable and relevant case law as well as substantive arguments fully setting forth its position, Defendant has failed to make any effort to ameliorate its arguments.  At best, Defendant's Post-Hearing brief (Doc. 85) at times includes citations to the Hearing transcript in an attempt to establish a certain factual assertion, although the arguments therein remain largely unsupported and incomplete.

86. Defendant further argues that the Plaintiffs lack standing because their property in Moscow, PA, has been foreclosed on and they therefore no longer own that property.  (Doc. 78, at 5; Doc. 85, at 13).  Citing only to two state law cases, both decided over 30 years ago, Defendant asserts that

> Plaintiffs no longer have a direct, immediate interest in the property and because Plaintiffs subsequently acknowledged that they settled any monetary claim to the dispute in question, the only potential, remaining claim has to deal with third party rights to specific performance to assert compliance with the terms of constructing an alternative sewage and waste water system. Plaintiffs are no longer affected by the system and, therefore, lack[] standing to challenge the performance.

(Doc. 78, at 6; Doc. 85, at 13).

87. Although Defendant does not invoke the doctrine of mootness, its argument in support of its assertion that Plaintiffs lack standing, *i.e.* because Plaintiffs no longer own the property, appears more suitably characterized as an assertion that Plaintiffs' claim is moot, a parallel doctrine bearing on the justiciability of a matter.

88. The Supreme Court has explained that:

> A case becomes moot – and therefore no longer a "Case" or "Controversy" for purposes of Article III – "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (*per curiam*) (some internal quotation marks omitted). No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute "is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Alvarez, supra,* at 93, 130 S.Ct. 576.

*Already, LLC.*, 568 U.S. at 91.

89. Here, Plaintiffs seek to enforce the terms of the COA, which specifically provides that "any party" may request "fines or penalties for failure of the Defendants to meet any of the time limits imposed in this agreement. . . ."  (Doc. 24, at ¶ 9).  Plaintiffs, as parties to the COA, are thus entitled to pursue a claim that Defendant is in contempt, and request "fines or penalties" within the parameters of contempt. Defendant's argument incorrectly presumes that the General Release, also signed in 2012, prevents Plaintiffs from pursuing any financial damages.[16]  The fact that Plaintiffs no longer live at the same property does not nullify their status as signatories to the COA and their ability to attempt to enforce the terms thereof.

90. "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party. . . . As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox v. Serv. Emps. Int'l Union, Local 100*, 567 U.S. 298, 307-308 (2012) (internal citations and quotation marks omitted).

91. Here, Plaintiffs have a concrete interest in the enforcement of the COA, an Agreement which resulted in them no longer pursuing their lawsuit.  Although Plaintiffs may no longer suffer the direct effects of Defendant's failure to install a new and fully functioning sewage system, therefore lessening their interest, a

---

[16] Although, for the reasons set forth, *infra*, in the "Damages" section of this Memorandum Opinion, the Court has found that the General Release bars recovery of certain compensatory sanctions, this finding should not be read as stating that the General Release bars Plaintiffs from pursuing other compensatory sanctions, including attorney's fees.

concrete interest still remains in so far as Plaintiffs are entitled to seek enforcement

of the provisions of the COA, an agreement which represents an arms-length,

bargained for understanding.

92. To find that Plaintiffs no longer have standing to pursue their claim because they no

longer reside at the same property would result in a windfall for Defendant by

condoning the mobile home park's long-term failure to abide by the terms of the

COA, and essentially now allow Defendant to repudiate that Agreement by not

having to take any further actions to comply with its terms, without consequence.

### C. Damages

93. In this case, for the aforementioned reasons, Plaintiffs have established by clear

and convincing evidence that a valid court order existed, that the defendant had

knowledge of the order, and that the defendant disobeyed the order by failing to

install a new and fully functioning sewage system.[17]  Defendant has failed to

establish that it cannot be held in contempt as a result of "impossibility" or

"substantial compliance."  Further, Defendant has not met its burden with respect to

its affirmative defenses of accord and satisfaction and the doctrine of laches and,

despite Defendant's assertions, Plaintiffs have established that they continue to

---

[17] By failing to install a new and fully functioning sewage system, Defendant also necessarily violated the terms of the COA requiring that it "complete final design documents", "apply for any required permits" and begin, and thus complete, construction of the "replacement" on lot sewage system (*see* Doc. 24, at ¶¶ 3-6) within the prescribed time periods.

have standing to pursue this action.  As a result, the Court finds the Defendant in civil contempt and turns to the issue of the appropriate remedy.

94. "Sanctions for civil contempt serve two purposes: 'to coerce the defendant into compliance with the court's order and to compensate for losses sustained by the disobedience.'" *Robin Woods Inc.*, 28 F.3d at 400 (quoting *McDonald's Corp. v. Victory Investments,* 727 F.2d 82, 87 (3d Cir. 1984)).

95. Thus, "penalties for civil contempt are limited to measures that may be appropriate to compel compliance with the underlying order and to compensate the opposing party for losses sustained as a result of the noncompliance." *Wedgewood Vill. Pharmacy, Inc. v. United States*, 421 F.3d 263, 268 (3d Cir. 2005) (citing *United States v. United Mine Workers,* 330 U.S. 258, 303-304 (1947)).

96. Where the purpose of the civil contempt sanction is coercive, the Court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United Mine Workers*, 330 U.S. at 304.  However, where the Court is "not dealing with a coercive sanction," but rather a compensatory sanction, "the contempt award must relate to the actual loss (including fees and expenses) that flowed from the contemnor's violation." *Inst. for Motivational Living, Inc. v. Doulos Inst. for Strategic Consulting, Inc.*, 110 F.App'x 283, 289 (3d Cir. 2004). *See also*, *United Mine Workers*, 330 U.S. at 303-304.

97. Here, in Plaintiffs' Memorandum in Support of Plaintiffs' First Amended Motion for

Contempt, Plaintiffs request the following relief:

> 1. Enter an Order finding that Defendants are in contempt of court;
>
> 2. Enter an Order directing Defendants to cease operation of the mobile home court, pursuant to Paragraph F of the Consent Order and Agreement;
>
> 3. Assess penalties against Defendants in favor of Plaintiffs for failure to meet the time limits imposed by the Consent Order and Agreement and for damages incurred;
>
> 4. Assess reasonable attorneys' fees against Defendants in favor of Plaintiffs;
>
> 5. Any other relief that the Court deems appropriate.

(Doc. 77, at 12).  In their Post-Hearing Brief, Plaintiffs more specifically request that

the Court order Defendant to cease operation of the mobile home court "unless and

until a new approved wastewater treatment system is installed and fully operational",

that the Court assess penalties against Defendant in the amount of $79,000, and

that the Court permit Plaintiffs to file a motion for attorneys' fees following the

issuance of a Court Order finding Defendant in contempt.  (*See* Doc. 84, at 8-12, 16

(proposed "Order of the Court")).

98. With respect to Plaintiffs' request for penalties in the amount of $79,000, Plaintiffs

assert that they are entitled to this specific amount "in order to restore the Plaintiffs

to the position that they would have held had the COA been obeyed."  (Doc. 84, at

9). Plaintiffs thus state that they "should be awarded damages in the amount that

they could have sold their home for minus the amount they still owed on their

mortgage." (Doc. 84, at 9). Citing to testimony from the hearing, Plaintiffs calculate

this amount to be $79,000, stating that they could have sold their home for $349,000

and that they still owed $270,000 on their mortgage. (Doc. 84, at 10).

99. Preliminarily, Louise Montalvan repeatedly testified that she and her husband

needed to sell their home because they could not afford the mortgage payments

and that they had not made a mortgage payment in eight years, since in or about

2009. (Montalvan Test. at 24, 32, 34, 61-62). Plaintiffs presented no evidence,

other than that of an entirely speculative nature, that the foreclosure proceedings on

the property were related to any of the violations of the COA that the Court has

found, *supra*. Rather, at the time the Plaintiffs filed the above-captioned action in

2011 and entered into the COA in 2012, Plaintiffs had already stopped making

payments on the mortgage for approximately two to three years and Plaintiffs

presented no evidence that they intended to re-commence mortgage payments

such that the property would not have been foreclosed on.

100.    In addition, Plaintiffs did not present any evidence that they would have been

able to sell the home for $349,000 after 2012 nor did they present sufficient

evidence that the failure to sell the home was the result of the ongoing sewage

issues.

101.     Mrs. Montalvan testified that the first time Plaintiffs tried to sell their home for approximately $389,000 "after the COA was put in place", "the woman didn't have enough money to put down a deposit, it fell through" and while there was an issue with Mr. Neville's personal tank (which is not the subject of the COA), Plaintiffs' lawyer at that time said "as long as the township feels that they're in agreement that everything is solved, try and sell your home."  (Montalvan Test., at 15-16). The first potential sale of the house thus was related to a lack of money by a buyer, and not any problems with the mobile home park's sewage system.

102.     Mrs. Montalvan further stated that they "went through that process [of trying to sell the home] for a little, but it became kind of undaunting."  (*Id*. at 16).  Plaintiffs therefore did not renew the six-month contract after it expired.  While Mrs. Montalvan stated that "once it failed and it was in the stream again, we had to take it off the market" she clarified that "[w]e just didn't renew the contract."  (*Id*. at 16-17). However, there was no testimony as to why she felt that the property should be taken off the market at that time or that she had been advised by counsel, the Township, or any other person that she could not continue to list the property for sale.

103.     Although Mrs. Montalvan testified that she later listed the property for sale again, this time for approximately $349,000-$369,000, Plaintiffs provided no evidence that this accurately reflected the value of the property or that the failure to sell the property the second time was due to any ongoing sewage issues.

104.     Mrs. Montalvan testified that she had two prospective buyers at that time, one

of whom made an offer of $200,000.  The record does not reflect that the other

prospective buyer ever made an offer.  While Mrs. Montalvan stated that in her

opinion, the sales did not occur due to Plaintiffs' "current situation with the stream

and the trailer park not having a functioning system", she was unable to offer any

evidence in support of this assertion.

105.     For the aforementioned reasons, despite Plaintiffs' assertion in their post-

hearing brief that they could have sold their home for $349,000 (Doc. 84, at 10), the

Plaintiffs have set forth no evidence that, even absent any problems arising from the

mobile home's sewage system, their property was valued at $349,000 or that they

could have otherwise sold it at, or near, that price.

106.     Mrs. Montalvan further admitted that she "didn't answer" a prospective buyer

who contacted her in or around 2017 "who wanted to short sell" the property

because she "was not 100 percent sure that my stream was totally clear" and she

did not want to be "responsible for the sale of that home and then be taken to court."

(Montalvan Test., at 36-37).  Mrs. Montalvan admitted this buyer was aware of the

lawsuit and COA and told her he wanted to be "secondary" on it.  She did not

explain why she rejected the prospective buyer's offer, despite his knowledge of the

situation, including whether she spoke with counsel or was acting at the advice of

someone with knowledge of what liability, if any, she and her husband faced.

107.    For the afore-mentioned reasons, Plaintiffs have not established that $79,000

accurately reflects an amount that compensates them "for losses sustained as a

result of the noncompliance," *Wedgewood Vill. Pharmacy, Inc.*, 421 F.3d at 268, or

that this amount "relate[s] to the actual loss (including fees and expenses) that

flowed from the contemnor's violation," *Inst. for Motivational Living, Inc.*, 110 F.App'x

at 289.

108.    In addition, the General Release executed in April, 2012, bars Plaintiffs from

receiving compensatory sanctions for any economic losses they may suffer to their

property and home due to any sewage and/or wastewater being released into the

unnamed tributary.[18]

109.    Here, the General Release acknowledged that the Nevilles and the Mobile

Home Park/Court "must comply with and [the Montalvans] have and maintain the

right to pursue and enforce the terms of the Consent Order and Agreement signed

by both the Releasors and Releasees and approved by the Court in the matter of

Roy Montalvan, et al. v. William Neville, et al., No. 3:11-CV-0850 (U.S. District Court

for the Middle District of Pennsylvania)".  However, the Release made clear that its

"intention" was "to ensure that the Releasees, with the exception of the

requirements of the . . . Consent Order and Agreement, have no further obligation of

---

[18] Although Defendant has repeatedly argued that the General Release bars Plaintiffs from obtaining economic damages, Plaintiffs inexplicably fail to address this General Release in their post-hearing briefs and the impact, if any, that this Release has on their current claim for damages.

payment to Releasors with respect to the Releasees alleged discharge of Sewage and/or Wastewater into the unnamed tributary of Wallenpaupack Creek." (Hr'g Ex., D-3). The General Release further stated that it was "expressly understood that the Releasors reserve the right to pursue and enforce the terms of the Consent Order and Agreement, pertaining to Releasees upgrading the Sewage and/or Wastewater Treatment and Disposal System on their property to accepted DEP standards, or ceasing to operate the trailer court and/or park." (*Id.* at 4).

110.    In turn, the COA specifically provides that "[a]ny request by any party for fines or penalties for failure of the Defendants to meet any of the time limits imposed in this agreement shall be made to the Court. . . ." (Doc. 24, at ¶ 9).

111.    Nonetheless, although the General Release explicitly allowed the Montalvans to pursue and enforce the terms of the COA, which necessarily included the above-quoted provision for "fines or penalties", the language of the General Release limited the type of economic damages to which Plaintiffs may be entitled pursuant to the terms of the COA. Specifically, the parties to the General Release acknowledged that the $50,000 "may not satisfy all of the undersigned's damages resulting from Sewage and/or Wastewater being released into the unnamed tributary of Wallenpaupack Creek*, including but not limited to past and future property damage and diminution of property values*" and thus reserved the right of the "undersigned" to "pursue and recover all damages from any person, firm, or entity who may be

responsible for payment of such damages" *with the exception of "any of the Releasees."* (Hr's Ex., D-3, at 2)(emphasis added).

112.     Thus, although the General Release preserved the Plaintiffs ability to request that the Court award them "fines or penalties for failure of the Defendants to meet any of the time limits imposed" in the COA (Doc. 24, ¶ 9), the General Release prevents this Court from awarding Plaintiffs the specific compensatory sanctions they seek, *i.e.* "the amount that they could have sold their home for minus the amount they still owed on their mortgage" (Doc. 84, at 9).

113.     Although the Court will not award Plaintiffs the $79,000 compensatory sanctions they seek, the language of the COA, in conjunction with the Court's findings of fact and conclusions of law, *supra*, and the testimony and evidence presented at the evidentiary hearing, entitle Plaintiffs to their requested civil contempt sanction that the Court order Defendant to cease operation of the mobile home court.

114.     As previously set forth, the COA contains two provisions which explicitly provide for this requested coercive sanction in the event that a new on-lot sewage and wastewater disposal system is not installed.  Pursuant to paragraph F of the Agreement:

> The parties acknowledge, that if a new on lot sewage and wastewater disposal system is not, or cannot, be installed on the property, for reasons of prohibitive costs, design flaws, or any other reason, Defendants will cease to operate the trailer court and will no longer rent spaces for trailers.

(Doc. 24, ¶ F).  In addition, Paragraph 7 provides:

> If Defendants are unable or unwilling to construct and install a new on lot sewage/wastewater disposal system, they will cease operating the trailer court. Cessation of operating the trailer court, will be done with due diligence, in a reasonable amount of time, and in a manner allowed by law. Defendants and their family will continue to reside in the homes on the property.

(*Id.* at ¶ 7).

115.    Here, the Court has already determined that the new disposal system has not been installed on the property and the COA makes clear that the mobile home park must therefore cease operating, regardless of the reason for this failure, whether it be "prohibitive costs" or "design flaws", the inability or unwillingness of Defendant to construct and install the system, or "any other reason".  Thus, the Court will order the enforcement of the specific terms of the COA, which reflects the parties' bargained-for agreement, including the specific remedies to be available for failure of the Defendant to abide by its terms, and order Neville's Mobile Home Court, LLC, to cease operation of the mobile home court and no longer rent spaces for trailers.[19]

Defendant will have until April 1, 2021 to effect an orderly and complete cessation of

---

[19] Neither this Court's Memorandum Opinion or Order should be read as precluding Defendant from resuming operations of Neville's Mobile Home Court, LLC if in the future Defendant should comply with the requirements of the COA that a new and fully-functional sewage system be completed and installed.  However, absent such an installation, this Court's Order mandates the cessation of operations, which will necessarily include the movement of tenants from the mobile home premises.

trailer park operations, with due regard for the need of trailer park tenants to secure other sites for re-location or alternative form of residences.[20]

116.    A party successful in establishing contempt may also entitled to compensatory damages in the form of attorney's fees and costs.  *See Robin Hood*, 28 F.3d at 401 ("Just as attorneys' fee awards are remedial and designed to compensate complainants for losses incurred as a result of the contemnors' violations, . . . so too are awards to cover the other expenses involved in demonstrating violations.") (internal citation and quotation marks omitted).  *See also, generally, Marshak*, 595 F.3d 478 (affirming award for attorney's fees as compensatory sanction for contempt but remanding case to district court on the basis that the contempt remedy could not be limited only to the imposition of attorney's fees).

117.    Because the award of compensatory sanctions for contemptuous conduct contemplates the award of attorney's fees when appropriate, Plaintiffs will be permitted to file a motion for attorney's fees within 30 days of the date of the instant Memorandum Opinion and accompanying Order.

---

[20] The amount of time allotted for cessation of operations has been extended by the Court largely to afford the Neville's Mobile Home Court, LLC's tenants sufficient time to find other residential arrangements as stated above.  The amount of time granted by the Court should not be understood as recognition by the Court of any interest on the part of Neville's Mobile Home Court, LLC which would otherwise justify the length of time for cessation of operations permitted by this Memorandum Opinion and the accompanying Order.

### III. CONCLUSION

For the aforementioned reasons, Plaintiffs' First Amended Motion for Contempt (Doc.

77) will be granted in part and denied in part as set forth in this Memorandum Opinion.

A separate Order follows.

Robert D. Mariani
United States District Judge